**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| JIMMIE SMITH,<br><br>        Petitioner,<br><br>   v.<br><br>J. FITTER, et al.,<br><br>        Respondent. | No. CV 07-5712-CJC (AGR)<br><br>ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION |

Pursuant to 28 U.S.C. § 636, the Court has reviewed the entire file de novo, including the Complaint, the Magistrate Judge's Report and Recommendation, the Objections to the Report and Recommendation, and all records in the file.  Having made a de novo determination, the Court agrees with the recommendation of the Magistrate Judge.

IT IS ORDERED that Judgment be entered granting Defendants' motions for summary judgment.

DATED: _May 4, 2009_

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT
9                     CENTRAL DISTRICT OF CALIFORNIA
10
11   JIMMIE SMITH,                          )   NO. CV 07-5712-CJC (AGR)
12              Plaintiff,                   )
13        v.                                 )
                                             )   REPORT AND
14   J. FITTER, et al.,                      )   RECOMMENDATION OF UNITED
                                             )   STATES MAGISTRATE JUDGE
15              Defendants.                  )
16                                           )
17   _____

18        The Court submits this Report and Recommendation to the Honorable

19   Cormac J. Carney, United States District Judge, pursuant to 28 U.S.C. § 636 and

20   General Order No. 05-07 of the United States District Court for the Central District

21   of California.  For the reasons set forth below, the Magistrate Judge recommends

22   that Defendants' motions for summary judgment be granted.

23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

I.

## SUMMARY OF PROCEEDINGS

On September 10, 2007, Plaintiff, who is incarcerated at Lancaster State Prison ("Lancaster"), filed a complaint pursuant to 42 U.S.C. § 1983 in which he set forth a claim for inadequate medical care against Defendants Fitter and Cassim, both medical doctors, in their individual capacity.

On November 24, 2008, Defendants filed separate motions for summary judgment and separate statements of uncontroverted facts.  On November 25, 2008, the Court issued a Notice to Plaintiff of the Requirements of Federal Rule 56 and Local Rule 56 in compliance with *Rand v. Rowland*, 154 F.3d 952, 959-62 (9th Cir. 1998) (en banc).  On January 5, 2009, Plaintiff filed an opposition, but failed to file a Statement of Genuine Issues in response to either defense motion. On February 9, 2009, Defendants filed separate replies.

The Court reviewed the complaint, as well as all attached declarations and evidence.  This matter was taken under submission without oral argument and is now ready for decision.

II.

## FACTUAL BACKGROUND

Fitter is a staff physician and surgeon at Lancaster and has been since 1999. (Fitter Decl. ¶ 1.)  From October 21, 2003, until March 28, 2006, Fitter was Acting Chief Medical Officer ("ACMO") at Lancaster. (*Id.* ¶ 3.)  As ACMO, Fitter had supervisory responsibility but no "direct responsibility for treatment of any patients." (*Id.*)

Cassim was a staff physician and surgeon at Lancaster from November 2001 to November 2006. (Cassim Decl. ¶ 1.)

Plaintiff arrived at Lancaster in March 2004. (Fitter Statement of Uncontroverted Facts ("Fitter SUF") No. 1; Cassim Statement of Undisputed

///

2

1  Material Facts ("Cassim SUF") No. 2; Opposition ¶ 1.[1])  On March 10, 2004,

2  Plaintiff was seen at Antelope Valley Hospital for shortness of breath and chest

3  pains. (Cassim SUF No. 3; Opposition ¶ 1.)  On March 15, 2004, Plaintiff was

4  discharged from Antelope Valley Hospital to the Central Treatment Center

5  ("CTC") at Lancaster for continued care.  (Cassim SUF No. 4; Opposition ¶ 2.[2])

6  On March 29, 2004, Plaintiff was discharged from CTC and was continued on

7  Coumadin.[3]  (Cassim SUF No. 5; Opposition ¶ 2.[4])

8          On April 16, 2004, Plaintiff saw Cassim.  (Cassim SUF No. 7; Opposition ¶

9  3.)  Plaintiff complained that his right leg was swollen and tender. (*Id.*)  Cassim

10  admitted Plaintiff to the CTC.[5]  (*Id.*)  Plaintiff was discharged from CTC on April

11  27, 2004.  (Cassim SUF No. 8.)

12          On May 5, 2004, Cassim saw Plaintiff.  (Cassim SUF No. 9; Opposition ¶

13  3.)  Cassim and Plaintiff agree that Plaintiff complained of leg swelling, but

14  Plaintiff states that he also complained he was in "extreme pain," whereas

15

16          [1] Plaintiff's Opposition is not admissible evidence as it was not "attested
17  under penalty of perjury."  *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir.
   2004).

18          [2] Plaintiff states that he was sent back to Lancaster "under the care and
19  supervision of Dr. Fitter and Dr. Cassim."  (Opposition ¶ 2.)  Plaintiff cites to ¶ 6 of
   Fitter's declaration and ¶ 3 of Cassim's declaration, but neither paragraph
20  supports Plaintiff's contention.  However, Cassim acknowledges that Plaintiff saw
   Cassim while Plaintiff was at CTC.  (Cassim SUF No. 6.)

21          [3] Plaintiff was diagnosed with "status post bilateral pulmonary emboli in the
22  right leg, deep vein thrombosis" and "status post pleurisy." (Cassim Decl. Ex. C.)

          [4] Plaintiff states that Fitter and Cassim ordered him to continue Coumadin.
23  (Opposition ¶ 2.)  Plaintiff cites to ¶ 4 of Cassim's declaration and ¶ 6 of Fitter's
   declaration, but neither paragraph supports Plaintiff's contention.
24

          [5] Plaintiff states that he complained to Cassim of "extreme pain and
25  swelling in his leg" and that Cassim "refused to physically examine the plaintiff's
   body."  (Opposition ¶ 3.)  Plaintiff cites to ¶ 5 of Cassim's declaration in support of
26  Plaintiff's contention that Cassim refused to examine him, but ¶ 5 flatly
   contradicts Plaintiff's statement.  Cassim's notes of his examination of Plaintiff
27  indicate that he examined Plaintiff's abdomen and found it to be "soft; non-tender,
   non-distended" and that Plaintiff did not complain of stomach pain. (Cassim Decl.
28  Ex. D.)

3

1    Cassim states that Plaintiff did not complain of pain. (Opposition ¶ 3; Cassim

2    Decl. ¶ 6.)  Cassim continued Plaintiff on Coumadin. (Cassim Decl. ¶ 6.)

3         On June 1, 2004, Plaintiff submitted a Reasonable Modification or

4    Accommodation Request ("ADA Request"). (Opposition ¶ 4; Curiel Decl. Ex. B;[6]

5    Fitter SUF No. 5.)  Plaintiff wanted an "outside specialist exam to adequately

6    diagnose and treat" him because of the "major blood clot in his right leg." (Curiel

7    Decl. Ex. B.)  Plaintiff wanted relief from the swelling and "[a]ny other relief

8    available to control and eliminate the pain and swelling." (*Id.*)  Contrary to

9    Plaintiff's assertion, the ADA Request does not indicate that Plaintiff suffered from

10   "excruiating (sic) pain." (*Id.*; Opposition ¶ 4.)

11        On June 7, 2004, Cassim saw Plaintiff. (Cassim Decl. ¶ 7; Opposition ¶ 4.)

12   Plaintiff states that Cassim "failed to conduct a physical examination."

13   (Opposition ¶ 4.)  However, there are progress notes of the visit. (Cassim Decl. ¶

14   7 & Ex. G.)  Dr. Cassim ordered tests and compression stockings. (*Id.*)  On June

15   7, 2004, Cassim completed a Physician Services Request for Plaintiff to see a

16   vascular surgeon at Mercy Hospital in Bakersfield. (*Id.* ¶ 7 & Ex. H.)  Plaintiff's

17   ADA Request was partially granted in that he was issued special stockings and

18   he was referred to the outside specialist. (Opposition ¶ 4; Fitter Decl. Ex. 10.[7])

19        On July 27, 2004, the vascular surgeon at Mercy Hospital found a mass in

20   Plaintiff's abdomen and ordered a CT scan. (Cassim SUF No. 14, Opposition ¶

21   5; Fitter Decl. Ex. 12.)

22   ///

23

24        [6] "Curiel Decl." refers to the Amended Declaration of John Curiel, who is a
     correctional counselor with the California Department of Corrections and
25   Rehabilitation.

26        [7] According to the Reviewer's Action form, Cassim interviewed Plaintiff on
     June 28, 2004, and was responsible for disposition of the ADA Request. (Fitter
27   Decl. Ex. 10.)  Fitter approved the disposition on July 1, 2004, in his capacity as
     ACMO. (*Id.* ¶ 7 & Ex. 10.)  Fitter did not examine Plaintiff but relied on Cassim's
28   report. (*Id.* ¶ 18.)

On July 28, 2004, Plaintiff complained to Cassim that he had blood in his urine for the last six days. (Cassim SUF No. 15; Opposition ¶ 5.) Cassim ordered an "urgent" CT scan of Plaintiff's abdomen.[8] (Cassim Decl. Ex. J.)

On September 3, 2004, Cassim saw Plaintiff, and when Cassim found out that the CT scan had not yet been performed, he tried to "expedite" it. (Cassim SUF No. 16.) Cassim contacted the Lancaster scheduler and a nurse, and "was advised that Plaintiff would be transported to an outside hospital as soon as the arrangements could be made." (Id.; Cassim Decl. ¶ 11.)

On October 1, 2004, Cassim saw Plaintiff, noted a tumor in Plaintiff's abdomen, and prescribed Tylenol for Plaintiff's pain. (Cassim SUF No. 18; Opposition ¶ 6.) Cassim also states that "the CT of the abdomen and pelvis was now scheduled."[9] (Cassim Decl. ¶ 12.)

On October 5, 2004, Plaintiff was transported to Mercy Hospital. (Opposition ¶ 6; Cassim SUF No. 19.) A urologist examined him and initially suspected prostate cancer. (Fitter Decl. Ex. 16.) However, a biopsy of the abdominal mass indicated non-Hodgkin's lymphoma of the pelvis. (Id. Ex. 17.) On October 8, 2004, Dr. Hau Chang operated on Plaintiff to remove the bladder tumor. (Id. Ex. 18.) The removal was unsuccessful, but Dr. H. Chang inserted a double j-stent in Plaintiff's right ureter to help the obstructed kidney drain. (Id.) According to Plaintiff, the surgeon told him that the stent should not be left in his body for more than 90 days. (Opposition ¶ 7; Plaintiff Depo. at 57-59.[10]) On

---

[8] Cassim states that because Lancaster did not have the ability to perform CT scans, Plaintiff had to have the scan done outside the prison. (Cassim Decl. ¶ 10.) Cassim also states that he had "no control over when a CT scan could be done" and that the "wait time between ordering a CT scan and receiving a CT scan could take many weeks." (Id.)

[9] The CT scan was scheduled for October 7, 2004. (Fitter Decl. Ex. 15.)

[10] Plaintiff's deposition transcript (without exhibits) is attached to Plaintiff's declaration. (Dkt. No. 54.)

October 14, 2004, a Port-A-Cath[11] was inserted into Plaintiff's chest to administer chemotherapy. (Opposition ¶ 7; Cassim Decl. Exs. O-P.) According to Plaintiff, the surgeon (Dr. Garcia) told him that the Port-A-Cath should not be left in his body for more than 180 days. (Opposition ¶ 7; Plaintiff Depo. at 57-59.)

On October 15, 2004, Plaintiff was discharged from Mercy Hospital and ordered to follow up with Dr. J. Chang for chemotherapy. (Cassim Decl. Ex. Q.) Vicodin was listed as a discharge medication. (*Id.*)

On October 18, 2004, Plaintiff began chemotherapy under Dr. J. Chang's supervision. (Opposition ¶ 8; Fitter Decl. ¶ 26.) Fitter telephonically approved Dr. J. Chang's prescriptions for various drugs, which did not include Vicodin. (Fitter Decl. ¶ 27 & Ex. 19.) Plaintiff received additional chemotherapy on November 8, 2004; December 6, 2004; January 10, 2005; February 7, 2005; and March 7, 2005. (*Id.* ¶ 28.) Plaintiff states that on all the chemotherapy dates he complained to Dr. James Chang about the "extreme pain," and each time Chang ordered Vicodin.[12] (Opposition ¶ 8.)

On January 10, 2005, Dr. J. Chang wrote to consult urologist to discontinue the stent "if possible." (Fitter Decl. Ex. 21 at 68.) On January 31, 2005, Dr. Chang wrote to have the urologist remove the stent. (*Id.* Ex. 22.)

On January 26, 2005, Plaintiff asked Cassim to prescribe Vicodin. (Opposition ¶ 9; Cassim Decl. ¶ 20.) Cassim gave Plaintiff Tylenol #3 instead of Vicodin. According to Dr. Cassim, both medications are "narcotics with nearly equivalent pain relieving capabilities which can be, and are, used interchangeably." (*Id.*) "Vicodin . . . was not authorized for use by inmates at

---

[11] There are many spellings of this device. Except when quoting someone, the Court will use this spelling.

[12] The medical records do not show Dr. J. Chang recommending Vicodin on November 8 or December 6, 2004. (Fitter Decl. Ex. 21 at 66-67.) On January 10 and February 7, 2005, there is a notation for Vicodin. (*Id.* at 68-69.) On March 7, 2005, there is a notation for Vicodin, but it is crossed out, and something is scribbled next to it followed by circled initials. (*Id.* at 70.)

1    Lancaster pursuant to the policy in effect at Lancaster," which Dr. Cassim did not

2    institute. (*Id.*[13])   According to Cassim, Vicodin is "highly addictive."  (*Id.*)

3           Plaintiff states that he saw Cassim on August 2, 2005, and complained to

4    Cassim about his continuing pain and non-removal of the stent. (Opposition ¶

5    10.)  Cassim states that after his visit with Plaintiff on January 26, 2005, he did

6    not see Plaintiff again until October 6, 2005, which was also the last time he ever

7    saw Plaintiff. (Cassim Decl. ¶ 22.)  The parties agree that the stent was removed

8    on August 24, 2005.  (Opposition ¶ 10; Cassim Decl. ¶ 21.)

9           On February 27, 2006, Dr. James Chang requested that the Port-A-Cath

10   be removed. (Opposition ¶ 12; Fitter Decl. ¶ 34 & Ex. 27.)  Chang filled out a

11   Physician Request for Services for the surgical removal of the Port-A-Cath, which

12   was approved on February 28, 2006, and assigned a tracking number. (Fitter

13   Decl. Ex. 28.)  According to Fitter, "the requested surgery would be set up by the

14   medical scheduler" at Lancaster. (*Id.* ¶ 36.)

15          On June 12, 2006, Plaintiff, in an inmate appeal ("602"), requested that "the

16   stems that was (sic) put in my body be taken out." (Curiel Decl. Ex. H; Opposition

17   ¶ 12.)  On June 30, 2006, Nurse Practitioner James Gocke examined Plaintiff.

18   (Fitter Decl. ¶ 39 & Ex. 31.)  Gocke wrote that the examination was, at least in

19   part, a follow-up to Plaintiff's filing of the 602 (Gocke wrote "602 F/U").  (*Id.* Ex. 31

20   at 93.)  Gocke also wrote that Plaintiff reported to him that the Port-A-Cath in his

21   chest had never been removed.  (*Id.*)  Gocke wrote that there was "Lt [left] upper

22   chest pain at site of catheter" and ordered a "surgical referral for removal

23   violation," including an x-ray to "evaluate location of catheter." (*Id.*)

24   ///

25   ///

26

27          [13]  Fitter, although not involved in prescribing of pain medication for
     Plaintiff, states that Vicodin "is not on the formulary of drugs available to
28   physicians" at Lancaster.  (Fitter Decl. ¶ 51.)

1    Plaintiff states that "the request to remove the Port-A-Cath was processed

2  on July 6, 2006."[14] (Opposition ¶ 12.)  Plaintiff also states that Fitter examined

3  him on July 6, 2006.  (*Id.*)  For both statements, Plaintiff cites to ¶ 41 of Fitter's

4  declaration.  Fitter, too, says that he examined Plaintiff on July 6, 2006.  (Fitter

5  Decl. ¶ 41.)  Fitter states that he does not remember discussing the Port-A-Cath

6  with Plaintiff on July 6, 2006, that he was not aware of Plaintiff's 602 on the issue,

7  and that if Fitter and Plaintiff had discussed either the removal of the Port-A-Cath

8  or the 602, Fitter would have noted that fact or those facts in the progress notes

9  but did not do so.  (*Id.* ¶ 42 & Ex. 33.)  Fitter ordered a CT scan to check for

10  evidence of cancer.  (*Id.* ¶ 41 & Ex. 33 at 98.)

11    On July 15, 2006, the chest x-ray ordered by Gocke was taken.  (*Id.* ¶ 43.)

12  On July 27, 2006, Fitter was assigned to review Plaintiff's 602, which required

13  him to interview Plaintiff.  (*Id.* ¶ 44 & Ex. 35.)  Fitter met with Plaintiff on August 3,

14  2006.  (*Id.* ¶ 45.)  Although Plaintiff wanted the Port-A-Cath removed, Fitter

15  determined it was "better . . . to wait for the results of the CT scan . . . to make

16  sure that Plaintiff's lymphoma was still in remission."  (*Id.*)  Fitter did not want to

17  remove the Port-A-Cath and then find out it had to be reinserted because of a

18  recurrence of the cancer.  (*Id.*)  In addition, Fitter "did not consider removal of the

19  port-o-cath to be an urgent matter, unless the port-o-cath had become dislodged,

20  had eroded through the vein, or had become infected," and he "did not see any

21  evidence that any of that occurred."  (*Id.*)

22    On September 12, 2006, Fitter signed a First Level Response to Plaintiff's

23  602, which stated, in part, that the "port-o-catheter will be left in place until the CT

24  scan is done and results are in."  (*Id.* ¶ 45 & Ex. 37.)

25    On October 3, 2006, Plaintiff reiterated in his 602 that the Port-A-Cath had

26  still not been removed.  (Opposition ¶ 13; Curiel Decl. Ex. H.)

27

28    ────────────

[14]  It is not clear what Plaintiff means by "processed."

1    On October 12, 2006, the Port-A-Cath was removed.[15] (Opposition ¶ 13;

2  Fitter Decl. ¶ 50.)

3    In August 2007, a second j-stent was inserted and later removed.

4  (Opposition ¶ 13 & Ex. E.)

5                                   III.

6                    **SUMMARY JUDGMENT STANDARD**

7    Summary judgment should be granted when "the pleadings, the discovery

8  and disclosure materials on file, and any affidavits show that there is no genuine

9  issue as to any material fact and that the movant is entitled to judgment as a

10  matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden of

11  production to demonstrate the absence of any genuine issue of material fact.

12  *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020,

13  1023-24 (9th Cir. 2004). A nonmoving party's failure to comply with local rules in

14  opposing a motion for summary judgment does not relieve the moving party of its

15  affirmative duty to demonstrate entitlement to judgment as a matter of law.

16  *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

17    "If the moving party shows the absence of a genuine issue of material fact,

18  the non-moving party must go beyond the pleadings and 'set forth specific facts'

19  that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895,

20  898 (9th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.

21  Ct. 2548, 91 L. Ed. 2d 265 (1986)). The non-moving party may not rely upon

22  mere allegations or denials in the pleadings but must set forth specific facts

23  showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby*

24  *Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

25    Where, as here, the nonmoving party is *pro se*, a court must consider as

26  evidence in opposition to summary judgment all contentions "offered in motions

27  _____

28    [15] None of the parties indicates whether the CT scan ordered by Fitter was
ever taken.

9

1 and pleadings, where such contentions are based on personal knowledge and set

2 forth facts that would be admissible in evidence, and where [the party appearing

3 pro se] attested under penalty of perjury that the contents of the motions or

4 pleadings are true and correct." *Jones*, 393 F.3d at 923.

5        On summary judgment, a court must view all evidence and any inferences

6 therefrom in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*,

7 84 F.3d 1194, 1197 (9th Cir. 1996). A plaintiff must "produce at least some

8 significant probative evidence tending to support" the allegations in the complaint.

9 *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). The

10 Court "need not examine the entire file for evidence establishing a genuine issue

11 of fact, where the evidence is not set forth in the opposing papers with adequate

12 references so that it could conveniently be found." *Carmen v. San Francisco*

13 *Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001). This is true even

14 when a party appears *pro se*. *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir.

15 2007). A court construes a *pro se* plaintiff's pleadings liberally. *Hearns v.*

16 *Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005).

17        Nevertheless, not every factual dispute will defeat summary judgment.

18 "[T]he mere existence of *some* alleged factual dispute between the parties will not

19 defeat an otherwise properly supported motion for summary judgment; the

20 requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*,

21 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) (emphasis in

22 original; citation and quotation marks omitted). "Where the record taken as a

23 whole could not lead a rational trier of fact to find for the nonmoving party, there is

24 no genuine issue for trial." *Id.* (citation and quotation marks omitted).

25                                    **IV.**

26                              **DISCUSSION**

27    **A.    Inadequate Medical Care Legal Standard**

28        Deliberate indifference to a prisoner's serious medical needs violates the

1   Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 32, 113 S. Ct. 2475,

2   125 L. Ed. 2d 22 (1993); *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L.

3   Ed 2d 251 (1976). The test for deliberate indifference has two parts. First, a

4   plaintiff must show a "serious medical need" by alleging that failure to treat a

5   prisoner's condition could result in further significant injury or the unnecessary

6   and wanton infliction of pain. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

7   Indications of such a need include "[t]he existence of an injury that a reasonable

8   doctor or patient would find important and worthy of comment or treatment; the

9   presence of a medical condition that significantly affects an individual's daily

10  activities; or the existence of chronic and substantial pain." *McGuckin v. Smith*,

11  974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX*

12  *Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

13        Second, a plaintiff must show that a defendant's response to the need was

14  deliberately indifferent. *Id.* This second prong of the test is satisfied when a

15  plaintiff alleges, as to each defendant, (1) a purposeful act or failure to respond to

16  a prisoner's pain or possible medical need and (2) harm caused by the

17  indifference. *Id.* Deliberate indifference to serious medical needs may be

18  manifested in two ways. "It may appear when prison officials deny, delay or

19  intentionally interfere with medical treatment, or it may be shown by the way in

20  which prison officials provide medical care." *Hutchinson v. United States*, 838

21  F.2d 390, 394 (9th Cir. 1988). Deliberate indifference is "a state of mind more

22  blameworthy than negligence" and "requires 'more than ordinary lack of due care

23  for the prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835,

24  114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (quoting *Whitley v. Albers*, 475 U.S.

25  312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)).

26        The defendant, however, must purposefully ignore or fail to respond to a

27  plaintiff's pain or serious medical needs. A plaintiff must allege that a defendant

28  had a sufficiently culpable state of mind when he or she refused medical care.

*Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002). A defendant must be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must also draw the inference. *Farmer*, 511 U.S. at 837. Thus, an inadvertent failure to provide adequate medical care, mere negligence or medical malpractice, a mere delay in medical care (without more), or a difference of opinion over proper medical treatment, are all insufficient to constitute an Eighth Amendment violation. *See Estelle*, 429 U.S. at 105-07; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). Intentional delays in providing medical care may manifest deliberate indifference. *Estelle*, 429 U.S. at 104-05. A plaintiff must show that the delay was harmful. *See Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994) (per curiam). However, "state prison authorities have wide discretion regarding the nature and extent of medical treatment." *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986).

**B.    Analysis**

Plaintiff appears to state the following subclaims: Defendants (1) "failed to properly treat" the tumor;[16] (2) "failed to remove the j-stents in a timely fashion"; (3) "failed to remove the Port-A-Cath in a timely fashion"; and (4) "failed to provide adequate pain medication." (Opposition ¶ 19.) As a result of Defendants' acts or omissions, Plaintiff had physical scarring, pain, leg swelling, temporary loss of kidney function, blood in urine, and the reinsertion of a j-stent. (*Id.*)

---

[16] Plaintiff's subclaim that Defendants failed to timely diagnose his cancer was not in the complaint. Defendants addressed the subclaim because Plaintiff testified at his deposition that it was one of his claims. (*See, e.g.,* Cassim Reply at 2 (citing Plaintiff's Depo. at 94:15-23).) Because Plaintiff put Defendants on notice of the claim during discovery, the Court will address Plaintiff's the new subclaim. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) ("the plaintiffs, who clearly stated ADEA claims of disparate treatment but sought also to pursue claims of disparate impact, were required either (1) to plead the additional disparate impact theory in their complaints, or (2) to make known during discovery their intention to pursue recovery on the disparate impact theory omitted from their complaints"); *see also Jefferson v. Chase Home Finance*, 2008 WL 1883484, *5-6 (N.D. Cal. 2008) (collecting cases).

The Court will address each defendant separately.[17]

### 1.    Cassim

### a.    Cancer Diagnosis

It is undisputed that the cancer was first suspected on July 27, 2004 (Opposition ¶ 5; Cassim SUF No. 14); and then diagnosed in October 2004. (Opposition ¶ 6; Cassim SUF No.18).

It is undisputed that Plaintiff saw Cassim for the first time in April 2004. (Opposition ¶ 3; Cassim SUF No. 7.)  However, the reason Plaintiff saw Cassim was because of problems with his right leg, not because of any problem with his abdomen. (*Id.*)  Although it is disputed whether Plaintiff complained to Cassim that he was in "extreme pain" (Opposition ¶ 3; Cassim Decl. ¶ 5), Plaintiff does not claim that he told Cassim that the pain was in his abdomen.  Moreover, Cassim's contemporaneous medical notes – which Plaintiff does not dispute – indicate that Cassim examined Plaintiff's abdomen and found it to be "soft; non-tender, nondistended." (Cassim Decl. Ex. D.)

Plaintiff next saw Cassim on May 5, 2004. (Opposition ¶ 3; Cassim SUF No. 9.)  Again, Plaintiff claims that he told Cassim he was in "extreme pain," but does not mention where the pain was. (Opposition ¶ 3; Cassim Decl. ¶ 6.)  Nor does the ADA Request Plaintiff submitted on June 1, 2004, indicate that Plaintiff had any pain anywhere other than in his right leg. (Curiel Decl. Ex. B.)  Plaintiff next saw Cassim on June 7, 2004, but although Plaintiff states that Cassim "failed to conduct a physical examination" (Opposition ¶ 4), Cassim's progress notes indicate otherwise. (Cassim Decl. Ex. G.)  On the same day, Cassim completed

---

[17] Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to at least some of the subclaims. (Cassim Reply at 3, 8, 9; Fitter Reply at 11, 13.)  Plaintiff argues that Defendants cannot raise this issue in a motion for summary judgment, that he has filed a number of grievances, and that no more remedies remain. (Opposition at 14-16.)  Because the Court recommends awarding summary judgment to Defendants, it need not address the exhaustion issue. *Davies v. Valdes*, 462 F. Supp. 2d 1084, 1091 n.7 (C.D. Cal. 2006).

a Physician Service Request for Plaintiff to see an outside vascular surgeon. (*Id.* Ex. H).

"[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. Even accepting Plaintiff's evidence as true, Plaintiff does not create a triable issue of material fact as to whether Cassim knew of, and was deliberately indifferent to, his medical needs. *Farmer*, 511 U.S. at 837; *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 524 (9th Cir. 1999) (doctor's failure to diagnose shows only negligence and not deliberate indifference); *see also Estelle*, 429 U.S. at 107 ("[T]he question whether an x-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment."). Moreover, at most there was a 3.5 month delay (mid-April to the end of July) between the date Plaintiff first saw Cassim and the date on which cancer was suspected. A mere delay in medical care, without more, is insufficient. Plaintiff has not shown that any delay was harmful.[18] *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam) ("mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference . . . unless the denial was harmful.")

### b.   J-Stents

It is undisputed that a j-stent was implanted in Plaintiff's right ureter on October 8, 2004. (Opposition ¶ 7; Fitter Decl. Ex. 18.) It is undisputed that the stent was removed on August 24, 2005, about 10.5 months later. (Opposition ¶ 10; Cassim Decl. ¶ 21.)

---

[18] Plaintiff testified that no medical professional has ever told him that "the delay in the diagnosis caused [his] condition to be worse." (Plaintiff Depo. at 103:24-104:2.) As of June 17, 2008, as far as Plaintiff knew, his cancer was in remission and had not recurred. (*Id.* at 104:3-18.)

14

1   Plaintiff argues that the j-stent should have been removed 3 months after it

2   was inserted because a surgeon told him that. (Opposition ¶ 7; Plaintiff Depo. at

3   57-59.) On January 10, 2005, Dr. Chang (whom Plaintiff saw for chemotherapy

4   at Mercy Hospital) made a note "to consult urologist to d/c stent if possible."

5   (Fitter Decl. Ex. 21 at 68.) On January 31, 2005, Dr. Chang wrote "have urologist

6   remove stent." (*Id.* Ex. 22.)

7   Plaintiff presented no evidence that Cassim saw or treated him after

8   January 26, 2005.[19] *See McGuckin*, 974 F.2d at 1062 (prisoner failed to create

9   triable issue absent evidence that defendant doctors were responsible for delay in

10   treatment). On February 16, 2005, Dr. Echendu interviewed Plaintiff and ordered

11   medication, lab tests and a follow-up visit in one month. (Curiel Decl. Ex. F.) On

12   April 4, 2005, Dr. Echendu prepared the Physician Request for Services to obtain

13   a urologist's evaluation as to the need for removal of the j-stent. (Fitter Decl. Ex.

14   23.) Plaintiff was examined by a urologist named Dr. H. Chang on July 12, 2005.

15   (*Id.* Exs. 23-24.) Dr. H. Chang recommended a CT scan of abdomen and pelvis.

16   (*Id.*) Dr. Fitter ordered the CT scan on the same day. (*Id.* ¶ 32 & Exs. 25-26.)

17   Cassim states he was asked to complete paperwork to have Plaintiff transported

18   to Mercy Hospital for j-stent removal. (Cassim Decl. ¶ 21.) That paperwork was

19   dated July 20, 2005, and approved by Dr. Fitter on August 2, 2005. (Fitter Decl. ¶

20   33 & Ex. 26.)

21   Even assuming Cassim was responsible for any delay in seeing a urologist

22   from January through July 2005, Plaintiff has not presented evidence of harm

23   caused by the delay. There is no mention of the j-stent or its removal in Plaintiff's

24   medical records or grievances after January 31, 2005 until the urologist, Dr. H.

25

26   _____

27   [19]   Dr. Cassim states that he did not see or treat Plaintiff after January 26, 2005 until October 6, 2005. (Cassim Decl. ¶¶ 21-22.) In the interim, Cassim was

28   asked to complete paperwork to have Plaintiff transported to Mercy Hospital to have the j-stent removed. (*Id.* ¶ 21.)

1  Chang, saw Plaintiff on July 12, 2005.[20]  (*Id.* Exs. 23-24.)  When the j-stent was

2  removed on August 24, 2005, the notes state that "bladder was normal, no tumor,

3  no stone is noted." (*Id.* Ex. 26.)

4  Plaintiff argues that the delayed j-stent removal in August 2005 caused an

5  otherwise unnecessary reinsertion of a stent and obstruction in his kidney two

6  years later in August 2007.  (Opposition ¶¶ 13, 19.)  Plaintiff provides a medical

7  record of Dr. Alleyne on August 9, 2007, indicating status post j-stent right ureter

8  and a significant decrease in pain "now that obstruction to rt kidney relieved." (*Id.*

9  Ex. E at 2.)

10  Plaintiff testified Dr. Alleyne told him that "when they took out the other one

11  [j-stent], that it was possible that they had left it in there so long until the healing

12  tissues, when it did heal back, it blocked the function of my liver and stuff got

13  inflamed." (Plaintiff Depo. at 90:16-19, 91:2-3.)  Plaintiff did not know whether Dr.

14  Alleyne told Plaintiff that there "would not have been any healing tissues if the

15  stent had been taken out earlier the first time." (*Id.* at 124:9-12.)

16  Plaintiff's testimony about what Dr. Alleyne told him is inadmissible

17  hearsay.  In any event, Plaintiff states only that he was told "it was possible."  The

18  medical records do not indicate any blocked function of the liver.  Further, the

19  medical records do not contain any indication that removal of the first j-stent in

20  August 2005 caused, two years later, an obstruction to the right kidney or the

21  need for insertion of a j-stent in August 2007.  Viewing the evidence in the light

22  most favorable to Plaintiff, there is no triable issue as to whether any delay

23  caused harm.  *See Shapley*, 766 F.2d at 407 (delay of surgery does not

24  constitute deliberate medical indifference unless delay was harmful); *compare*

25  ///

26

27  [20]  Plaintiff's grievance on February 7, 2005 was based on denial of the

28  correct pain medication for his cancer and chemotherapy treatments, not j-stent
removal. (Curiel Decl. Ex. E.)

1 | *Jett*, 439 F.3d at 1098 (triable issue created when doctor's notes indicate harm
2 | caused by delay).

3 |             **c.**    **Port-A-Cath**

4 |        Although Plaintiff appears to argue that all of his subclaims are against
5 | both defendants, in his deposition he stated clearly that his subclaim involving the
6 | delay in removing the Port-A-Cath was only against Fitter:

7 |      Q   Did you ever complain to Dr. Cassim that the porta-catheter was
8 |           causing any trouble?
9 |      A   No.  Just Fiddler (sic).
10 |      Q   Okay.  So is it fair to say that you're not suing Dr. Cassim about
11 |           anything with respect to the porta-catheter?
12 |      A   No.
13 |      Q   I'm sorry.  Yes, that is fair to say?
14 |      A   Fair to say, yeah.
15 |      Q   Okay.  So the three claims that you're making as to Dr. Cassim are the
16 |           delay in diagnosing the cancer, the failure to give you Vicodin instead
17 |           of what he gave you a prescription for, which was the Tylenol 3, and
18 |           the failure to have the J stent taken out sooner?
19 |      A   Yes.
20 |      Q   Are you making any other claims against Dr. Cassim with respect to
21 |           your medical care in this case?
22 |      A   No.
23 | (Plaintiff's Depo. at 119:3-20.)

24 |        In addition, Plaintiff fails to present any evidence that Dr. Cassim had any
25 | involvement as to the Port-A-Cath.  It is undisputed that on February 27, 2006,
26 | Dr. James Chang requested that the Port-A-Cath be removed.  (Opposition ¶ 12;
27 | Fitter Decl. ¶ 34 & Ex. 27.)  There is no evidence that Dr. Cassim saw or treated
28 | Plaintiff in 2006.  Plaintiff has failed to create a triable issue of fact as to Dr.

1   Cassim's deliberate indifference. *See McGuckin*, 974 F.2d at 1062 (prisoner

2   failed to create triable issue given absence of evidence defendant doctors were

3   responsible for delay in treatment).

4                              **d.   Pain Medication**

5           It is undisputed that Dr. J. Chang recommended Vicodin for pain on

6   January 10 and February 7, 2005. (Fitter Decl. Ex. 21 at 68-69; *see supra* n.12.)

7           However, Cassim prescribed Tylenol #3 with codeine. (Cassim Decl. ¶

8   20.) Cassim states the two drugs are "nearly equivalent" and are "used

9   interchangeably."[21] (*Id.* ¶ 20.) A difference in medical judgment between Dr.

10  Chang and Dr. Cassim is insufficient to raise a triable issue of fact as to

11  deliberate indifference. *See Estelle*, 429 U.S. at 107; *Jackson*, 90 F.3d at 332

12  ("[W]here a defendant has based his actions on a medical judgment that either of

13  two alternative courses of treatment would be medically acceptable under the

14  circumstances, plaintiff has failed to show deliberate indifference, as a matter of

15  law."). "[A] prisoner must show that the chosen course of treatment 'was

16  medically unacceptable under the circumstances,' and was chosen 'in conscious

17  disregard of an excessive risk to [the prisoner's] health.'" *Toguchi v. Chung*, 391

18  F.3d 1051, 1058 (9th Cir. 2004) (affirming summary judgment where evidence

19  showed difference of medical opinion as to choice of one drug over another).

20  Plaintiff has failed to produce such evidence. Accordingly, summary judgment is

21  appropriate with respect to this subclaim. *Id.*

22                              **2.   Fitter**

23          From October 21, 2003, until March 28, 2006, Fitter was ACMO at

24  Lancaster. (Fitter Decl. ¶ 3.) As ACMO, Fitter had supervisory responsibility but

25  no "direct responsibility for treatment of any patients." (*Id.*) The first time Fitter

26

27          [21]   Vicodin is not on Lancaster prison's formulary of drugs. (Cassim Decl.
28  ¶ 20; Fitter Decl. ¶ 51.) Plaintiff does not dispute this fact. Cassim explains that
    Vicodin is "highly addictive." (Cassim Decl. ¶ 20.)

1  ever examined Plaintiff was on July 6, 2006.  (*Id.* ¶ 41; *see also id.* ¶¶ 7, 9, 11,

2  18, 25 (indicating no earlier examinations).)  Plaintiff's only statement to the

3  contrary is that after his discharge from Antelope Valley Hospital in March 2004,

4  he was sent back to Lancaster "under the care and supervision of Dr. Fitter and

5  Dr. Cassim."  (Opposition ¶ 2.)  However, as the Court already noted, Plaintiff's

6  evidentiary citations do not support Plaintiff's assertion that he was under Fitter's

7  care.  (*See supra* n.2.)

8      "Liability under § 1983 must be based on the personal involvement of the

9  defendant."  *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  "An

10  officer's liability under section 1983 is predicated on his 'integral participation' in

11  the alleged violation."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12

12  (9th Cir. 2007) (citation omitted).  A person may also be liable if the actor "set[s]

13  in motion a series of acts by others which the actor knows or reasonably should

14  know would cause others to inflict the constitutional injury."  *Johnson v. Duffy*,

15  588 F.2d 740, 743-44 (9th Cir. 1978).

16      However, "[r]*espondeat superior* or vicarious liability will not attach under §

17  1983."  *Collins v. City of Harker Heights*, 503 U.S. 115, 123, 112 S. Ct. 1061, 117

18  L. Ed. 2d 261 (1992) ("*Respondeat superior* or vicarious liability will not attach

19  under § 1983.") (citation and internal quotation marks omitted).  "A supervisor is

20  only liable for constitutional violations of his subordinates if the supervisor

21  participated in or directed the violations, or knew of the violations and failed to act

22  to prevent them."  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

23                              **a.    Cancer Diagnosis**

24      It is undisputed that the cancer was first suspected on July 27, 2004

25  (Opposition ¶ 5; Cassim SUF No. 14), and then diagnosed in October 2004.

26  (Opposition ¶ 6; Cassim SUF No.18).  It is undisputed that Fitter had no

27  interaction with Plaintiff before the cancer diagnosis.  (Plaintiff Depo. 62:5-6.)

28  ///

                                        19

1    Because Fitter was not directly involved in the alleged failure to timely
2  diagnose Plaintiff's cancer, his only possible liability would be as a supervisor.
3  However, Plaintiff has presented no evidence that Fitter knew of Plaintiff's
4  treatment before the cancer diagnosis and somehow failed to prevent Cassim's
5  alleged failure to diagnose the cancer.  Indeed, Plaintiff admits that Fitter's only
6  responsibility with respect to the failure to diagnose the cancer was "because he
7  was in charge." (Plaintiff Depo. at 100:3-9.)

8    Accordingly, Plaintiff has not created a genuine issue of material fact as to
9  Fitter's liability with respect to this subclaim.

### b.    J-Stents

11   As previously noted, it is undisputed that a j-stent was implanted in
12 Plaintiff's right ureter on October 8, 2004.  (Opposition ¶ 7; Fitter Decl. Ex. 18.)  It
13 is also undisputed that the stent was removed on August 24, 2005, about 10.5
14 months later.  (Opposition ¶ 10; Cassim Decl. ¶ 21.)

15   Also as previously discussed, Dr. J. Chang's January 10, 2005 notes state:
16 "Please consult urologist to D/C [discontinue] stent if possible." (Fitter Decl. Ex.
17 21 at 68.)  Dr. J. Chang's January 31, 2005 notes state:  "Please have urologist to
18 remove stent." (*Id.* Ex. 22.)

19   Plaintiff argues Fitter should be liable for the delay in removing the j-stent
20 because "[h]e was in charge." (Plaintiff Depo. at 71:3-10; *see also id.* at 88:4-6
21 ("I'm suing Dr. Fitter because he was the head medical staff at that time, yes, and
22 he was the overseer of the rest of the doctors at that time, yes.").)  Plaintiff admits
23 that Fitter never refused to remove the stem. (*Id.* at 89:5-16.)

24   Plaintiff has presented no evidence that Fitter delayed the removal of the j-
25 stent, or that he knew of any delay and failed to prevent it, or that he was even
26 aware of Dr. J. Chang's notes.

27   Accordingly, Plaintiff has not created a triable issue as to Fitter's liability
28 with respect to this subclaim.

### c.   Port-A-Cath

It is undisputed that on October 14, 2004, a Port-A-Cath was inserted into Plaintiff's chest to administer chemotherapy (Opposition ¶ 7; Cassim Decl. Exs. O-P).  About two years later, on October 12, 2006, the Port-A-Cath was removed (Opposition ¶ 13; Fitter Decl. ¶ 50).

Plaintiff states that he was told by his outside surgeon that the Port-A-Cath should not be left in his body for more than six months.  (Opposition ¶ 7; Plaintiff Depo. at 57-59.)  Plaintiff testified that the surgeon did not articulate the risks of leaving the Port-A-Cath in for longer than six months, or why it was necessary to remove the Port-A-Cath after six months.  (Plaintiff Depo. at 59:6-15.)

It is undisputed that on February 27, 2006, Dr. J. Chang requested that the Port-A-Cath be removed.  (Opposition ¶ 12; Fitter Decl. ¶ 34.)  Dr. J. Chang filled out a Physician Request for Services for the surgical removal of the Port-A-Cath, which was approved on February 28, 2006, and assigned a tracking number. (Fitter Decl. Ex. 28.)  Plaintiff has presented no evidence that Fitter knew of the Physician Request for Services.  Plaintiff testified that he had no knowledge when, if ever, Fitter knew of J. Chang's orders, and testified only that Fitter should have read the records when Plaintiff returned from the hospital.  (Plaintiff Depo. at 77:24-78:3.)

The first evidence of any involvement by Fitter in the Port-A-Cath issue was when he examined Plaintiff on July 6, 2006.  (Fitter Decl. ¶ 41.)  Although Plaintiff submitted a grievance that possibly (Plaintiff requested removal of "stems") addressed this issue on June 12, 2006, Fitter states that he was unaware of the grievance until at the earliest July 27, 2006.[22]  (*Id.* ¶ 44.)  Certainly, by August 3, 2006, when Fitter interviewed Plaintiff, Fitter acknowledges that Plaintiff told him that he wanted to have the Port-A-Cath removed.  (*Id.* ¶ 45.)  However, first, Fitter

---

[22]  Plaintiff testified that he did not recall "clearly" talking to Fitter about Plaintiff's grievance.  (Plaintiff Depo. at 30:5-11.)

1  determined in his medical judgment that it would be medically preferable to

2  perform a CT scan in order to make sure the lymphoma was still in remission

3  before removing the Port-A-Cath; and, second, the Port-A-Cath was removed

4  only two months after this. (*Id.*; Opposition ¶ 13.)  As discussed above, a

5  difference in medical judgment is insufficient to create a triable issue of fact.

6  *Estelle*, 429 U.S. at 107.

7      Moreover, the only possible delay "caused" by Fitter was brief.  In fact, the

8  removal of the Port-A-Cath proceeded, without interference by Fitter and

9  independently of Fitter, pursuant to Chang's and Gocke's Physician Requests for

10  Services to have the Port-A-Cath removed.  (Fitter Decl. ¶ 46 & Exs. 28, 32.)

11      Finally, Plaintiff has presented no evidence of harm caused by the delay in

12  removing the Port-A-Cath other than his statement that he was in "unnecessary

13  and pointless pain."  (Opposition ¶ 25.)  However, Plaintiff has presented no

14  evidence that the pain was caused by the presence of the Port-A-Cath.  In any

15  event, Plaintiff admits that, in response to Plaintiff's complaints, Fitter increased

16  Plaintiff's pain medication.  (*Id.* ¶ 21.)

17      Accordingly, Plaintiff has not created a triable issue as to Fitter's deliberate

18  indifference with respect to this subclaim.

19                  **d.    Pain Medication**

20      It is undisputed that Dr. J. Chang recommended Vicodin for Plaintiff's pain

21  on January 10 and February 7, 2005.  (Fitter Decl. Ex. 21 at 68-69; *see supra*

22  n.12.)

23      Plaintiff has presented no evidence that Fitter was aware of J. Chang's

24  recommendations.  Plaintiff testified that the only two people he complained to

25  about his inability to obtain Vicodin were MTA White and Cassim.  (Plaintiff Depo.

26  at 17:1-18:9.)  Plaintiff testified that Fitter never refused to give Plaintiff Vicodin.

27  (*Id.* at 23:3-6.)

28      Fitter acknowledges approving all of J. Chang's prescriptions on October

18, 2004, which did not include Vicodin.  (Fitter Decl. ¶ 27 & Ex. 19 at 62.)  In addition, Dr. Fitter prescribed Tylenol # 3 with codeine on that date.  (*Id.* ¶ 27 & Ex. 20.)  Dr. Fitter was not aware that Plaintiff requested Vicodin and he never refused to prescribe Vicodin to Plaintiff.  (*Id.* ¶ 51.)

Accordingly, Plaintiff has failed to create a triable issue as to Fitter's liability with respect to this subclaim.

## C.    Conclusion

Even viewing the evidence "in the light most favorable" to Plaintiff (*see Bagdadi*, 84 F.3d at 1197), Plaintiff has failed to create a genuine issue of material fact.  *Scott*, 127 S. Ct. at 1776.  Defendants are therefore entitled to summary judgment.

## V.

## RECOMMENDATION

For the reasons discussed above, it is recommended that the District Court issue an Order (1) adopting this Report and Recommendation and (2) granting Defendants' motions for summary judgment.

DATED: March 19, 2009

ALICIA G. ROSENBERG
United States Magistrate Judge

23